| MOAN BERNARD ARMSTRONG, Chief Judge.
The appellant, Bay Coquille, Inc., appeals a judgment of June 26, 2003, denying its motion for summary judgment for indemnity against the appellee, R & B Falcon Drilling USA, Inc. (hereinafter “Falcon”), and granting the motion for summary judgment of Falcon for indemnity against the Bay Coquille in a personal injury claim brought by the original plaintiff, Darían Darty. We affirm. Written reasons were given for designating this partial judgment as final and that determination is not contested on this appeal.
This matter arises out of a personal injury sustained by the plaintiff, Darían Darty, a wage employee of Tom’s Welding, but also arguably a borrowed employee of the appellee, Falcon. The alleged accident took place during the transfer of cargo from a materials barge to Falcon’s Rig #20, a submersible drilling barge employed in drilling the Delesdernier No. 9 well in Plaquemines Parish, where Darty was working. However, the merits of Darty’s personal injury claim are not part of this appeal. The appeal concerns only Falcon and Bay Coquille’s claims for indemnity against each other.
| ?Darty filed his claim in state court under the Jones Act and General Maritime Law against Transocean Offshore USA, Inc. and Bay Coquille, Inc. In an amended petition, Darty named Falcon as a defendant. Falcon filed a cross claim against Bay Coquille alleging that Darty was employed by Tom’s Welding Services and that in turn Tom’s Welding Services was retained by Bay Coquille. More importantly, Falcon alleged that Bay Coquille was contractually obligated to indemnify it. Bay Coquille answered and filed a cross claim for indemnity against Falcon. Falcon moved for summary judgment and Bay Coquille filed a cross motion for summary judgment.
The indemnity claims of Bay Coquille and Falcon against each other arise from the reciprocal indemnity provisions found in § 14.8 and § 14.9 of the “International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract” (hereinafter “Contract”) between Falcon and Bay Coquille. It is undisputed that this is a maritime contract. According to the parties, the crux of this case is whether the term “employees” found in § 14.8 and § 14.9 includes “borrowed employees.” However, there is more to interpreting the reciprocal indemnity provisions than just devining the meaning of the term “employees.”
§ 14.9 of the Contract provides in pertinent part for Bay Coquille’s indemnity of Falcon:
Operator’s [Bay Coquille’s] Indemnification of Contractor [Falcon]: Operator agrees to release, defend, indemnify, and hold harmless, Contractor, its officers, directors, employees and joint owners from and against all claims, demands and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or ^parties, arising in connection herewith in favor of Operator’s employees or Operator’s [Bay Coquille’s] contractors or their employees, or Operator’s invitees, other than those parties identified in paragraph 14.8 on account of bodily injury, death or damage to property ... [Emphasis added.]
Thus § 14.9 requires Bay Coquille to indemnify Falcon “on account of bodily injury, death or damage to property” for *109 claims made by Bay Coquille’s “contractor’s or their employee.” It is uncontested that Bay Coquille contracted for the services of Tom’s Welding and that the original personal injury plaintiff herein, Darían Darty, was a wage employee of Tom’s Welding. Consequently, if the only issue in the case were whether Darían Darty was an employee of one of Bay Coquille’s contractors we would simply conclude that Bay Coquille owes indemnity to Falcon under § 14.9 of the Contract. However, Bay Coquille points to what it refers to as the “Exception Clause” in § 14.9, which modifies the reference to Bay Coquille’s “contractors or their employees” by limiting them to those “contractors and their employees ... other than those parties identified in paragraph 14.8 ...” [Emphasis added.]
§ 14.8 provides in pertinent part for Falcon to indemnify Bay Coquille:
Contractor’s [Falcon’s] Indemnification of Operator [Bay Coquille]: Contractor agrees to release, defend, indemnify, and hold harmless, Operator, its officers, directors, employees and joint owners from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor’s [Falcon’s] employees or contractor’s subcontractors or their employees, or Contractor’s invitees, on account of bodily injury, death or damages to property.... [Emphasis added.]
|4The “Exception Clause” in § 14.9 refers to, among others, Falcon’s “employees,” as Falcon’s employees are “parties identified in paragraph 14.8.” Thus when read together § 14.8 and § 14.9 are, § 14.9 requires Bay Coquille to indemnify Falcon for claims of bodily injury for employees of its contractors such as Darty, with the exception of claims made by Falcon’s employees. Bay Coquille alleges that Darty is Falcon’s borrowed employee, thereby, under the Exception Clause transferring the obligation to indemnify from Bay Coq-uille to Falcon. Falcon counters that the term “employees” found in § 14.8 refers only to traditional direct wage paid employees and not to employees by operation of law such as borrowed employees.
Bay Coquille explains that the Exception Clause is necessary because Falcon and its employees would qualify as one of Bay Coquille’s contractor’s or its employees under § 14.9, which would nullify Falcon’s indemnity obligations to Bay Coquille if one of Falcon’s employees were injured.[1] Put another way, it is Bay Coquille’s contention that the “Exception Clause” refers to Falcon and its employees solely for the purpose of preventing the reciprocal indemnity provision from canceling itself out. From this we conclude that the Exception Clause was not intended to apply to situations in which Bay Coquille may have contracted with a party other than Falcon, such as Tom’s Welding, Darty’s wage paying employer. Thus, the Exception Clause provides this Court with no insight into the intention of the parties regarding the question of whether the term “employees” includes | sborrowed employees. Moreover, even if the Exception Clause could be said in some way to support Bay Coquille’s contention that the *110 term “employees” was intended to include borrowed employees, it still doesn’t help us determine whether the fact that Darty may be considered Falcon’s borrowed employee should take precedence over his initial and continuing status as an employee of a non-Falcon contractor retained by Bay Coquille.
While Falcon and Bay Coquille attempt to persuade this Court that, in effect, almost as a matter of law, the term “employees” either includes borrowed employees according to Bay Coquille, or does not according to Falcon, we find that the intent of the parties controls. We find nothing in the law or public policy that prevents the parties form entering into a contract that could be read as either Bay Coquille or Falcon suggest, i.e., the task of this Court in this case is initially to determine whether it was the intent of the parties that the term “employees” in the contract should also include borrowed employees. If it was not the intent of the parties to include borrowed employees, the judgment of the trial court must be affirmed without further inquiry as Bay Coquille effectively concedes that the only sense in which Darty might be considered an employee of Falcon is as a borrowed employee. If, on the other hand, it was the intent of the parties to include borrowed employees, then this Court must concern itself with whether Darty was Falcon’s borrowed employee. But the consideration does not end there. As noted at the conclusion of the previous paragraph, even if we find that Darty is Falcon’s borrowed employee, we must then decide whether Darty’s initial and ongoing | fistatus as an employee of a contractor of Bay Coquille should be given priority over his status as a borrowed employee of Falcon for indemnity purposes.
Falcon argues that these indemnity provisions are what have “been commonly known in the industry as “knock for knock,” reciprocal[2] indemnity” provisions, based solely upon party affiliation, and not based in any way upon fault findings or confusing requirements of determining whether an accident arose in a particular way. Bay Coquille acknowledges that this is a “knock for knock” contract, but contends that the term “employees” found in the indemnity provisions includes “borrowed employees.” Falcon counters that, as a matter of standard industry practice, the term “employees” in the reciprocal indemnity “knock for knock” provision of the Contract was not intended to include “borrowed employees.” Instead, Falcon argues that the intent of the Contract is crystal clear:
[Njamely that the reciprocal indemnity provisions embody the maxim “I’ll take care of mine and you take care of yours”, because that is the easiest, least confusing way for the parties to an IADC drilling contract to apportion responsibilities by was of indemnity in such a contract. Older drilling contracts in the 1970s-1980s, that based indemnity Upon fault findings of some sort, or upon whether an accident occurred from certain work activities, presented confusion and uncertainty, and have thus slowly been discarded over the years in favor of what has now been commonly called the industry norm of “knock for knock based on party affiliation.”
In other words, Falcon argues that Darty’s “party affiliation” must be with Bay Coquille because Bay Coquille contracted with Darty’s employer, Tom’s Welding and it was Bay Coquille, not Falcon, that paid Tom’s Welding for Darty’s services. However, Falcon offered no affidavits, documentary evidence or deposition *111 evidence to support its contention concerning the nature of standard 17industry practice in general, nor to support its specific argument concerning the meaning of the term “employees.” As the industry practice is not a matter of which this Court may take judicial notice, we are unable to find in favor of Falcon based on its industry practice argument. Instead we will review relevant legal authorities cited by the parties, as well as others revealed by the research of this Court.
Cormier v. Rowan Drilling Co., 549 F.2d 963, 969-970 (5 Cir.1977), provides an excellent explanation of the purpose, operation and intended effect of reciprocal indemnity provisions:
However, Rowan’s half of the agreement contained the following additional provision:
“By way of illustration, but not by way of limitation, any person who is on Contractor’s payroll and receives, has received, or is entitled to receive payment from Contractor in connection with the work performed hereunder shall be the employee of Contractor, even though Company reimburses Contractor the amount paid such employee.”
The whole purpose behind these provisions is to make sure that the contractor (Rowan) and the company (Continental) are each solely responsible for anything that happens to their own respective employees, regardless of fault. In the most specific detail, which writes over or around any possible tort or maritime theory by which liability could be palmed off on the other, the contracts identify precisely the respective indemnity obligations between the parties to the contract with respect to the employees of each. Thus, the waiver of indemnity between the two parties so far as it goes is complete without regard to the negligence of either party, the unseaworthiness of any vessel or the breach of underlying contractual obligations.
But precise as it is as between Rowan and Continental respecting a claim by their respective employees, it prescribes nothing as to claims by third parties or the employee of a third party.
|sThis carefully drawn, commonly used contractual provision reflects a practical, efficient agreement by parties faced with sharing, apportioning or underwriting the economic risks of offshore drilling. It is a means by which unnecessary insurance costs are avoided, the ultimate bearer being the owner for whom others contract.
The reciprocal indemnity provisions between Continental and Rowan avoids this doubling of costs to the owner, Continental. Thus, the reciprocal indemnity provision requires each party to carry adequate self-insurance and results in a dove-tailed, highly integrated insurance program, the practical effect of which is to impose on each (and their insurers) the sole and ultimate loss arising out of injury to the respective employees of each. This inures to the benefit of all involved, since it cuts out needless insurance costs (which are undoubtedly passed along to the final consumer at some point). Also, to the extent that it clearly defines the respective indemnity obligations of both parties, it cuts down on unnecessary litigation costs.
[Emphasis added.]

Id.

We find that the language highlighted above in the quotation from Cormier sets forth the two policy considerations underpinning the use of reciprocal indemnity agreements such as the one at issue in the instant case: (1) The elimination of the *112 expense of redundant insurance coverage and (2) a reduction in unnecessary litigation and its concomitant expense. This means that while an employee may be considered for some purposes such as workers’ compensation to be simultaneously the employee of one employer and the borrowed employee of another, for purposes of a reciprocal indemnity provisions an employee cannot simultaneously be an employee of both parties to the indemnity agreement because that would defeat the purpose of the indemnity agreement of eliminating the cost of both parties having to insure and litigate for the same employee. Thus, reciprocal indemnity provisions such as those involved in the instant case are designed to | flaccomplish more than the ordinary one way indemnity provisions which means that cases involving one way indemnity provisions are not persuasive where reciprocal provisions are involved.
It follows that there is no merit in Bay Coquille’s third assignment of error, in which Bay Coquille argues in the alternative that Falcon’s defense and indemnity obligations to Bay Coquille under § 14.8 for the bodily injury claims of Falcon’s employees and Bay Coquille’s identical defense and indemnity obligations to Falcon under § 14.9 were “extinguished by the doctrine of confusion” as concerns the personal injury claims of Darían Darty.
Falcon had addressed Bay Coquille’s third assignment of error by contending that Bay Coquille failed to raise the issue below and cannot now raise it for the first time on appeal.
La. C.C.P. art. 1005 includes among enumerated affirmative defenses that must be set forth in the answer the “extinguishment of the obligation in any manner.” La. C.C. art.1908 explains that obligations are extinguished by confusion, consistent with the statement quoted above from Bay Coquille’s original brief on appeal. Therefore, the issue of confusion raised by Bay Coquille’s third assignment of error is an affirmative defense that must be raised by Bay Coquille’s answer or any proper amendment thereto.
We note that in its answer, Bay Coquille pleads confusion as its third enumerated affirmative defense. We also find where Bay Coquille pursued the issue in proceedings below. Therefore, Bay Coquille is entitled to have this Court consider its confusion argument, but, as already noted above, we find no merit in that argument.
Rodrigue v. LeGros, 568 So.2d 248 (La.1990) stands for the propositions that, “By allowing indemnity provisions to be fully enforceable, the federal maritime law gives parties the contractual freedom to allocate risks between themselves”[3]; and “each case necessarily turns upon the language of the indemnity agreement at issue.”[4] However, there was no borrowed employee issue before the court in Ro-drigue so that case provides no direct insights into whether the term “employees” in the reciprocal indemnity provision in the instant case includes borrowed employees. What Rodrigue does tell us is that we should give great weight to the intention of the parties and their freedom to contract in our interpretation of the reciprocal indemnity provision, rather than relying on general tort principles. Id., at p. 254-255. Applied to the instant case, Rodrigue supports the conclusion that we should interpret the contract in the manner that best effectuates the dual goals of reciprocal indemnity agreements, i.e., the elimination of both the expense of overlapping insurance *113 coverage and the inefficiency and expense of unnecessary litigation.
That it is possible for the term “employee” in a contract to include borrowed employees may be seen by reference to Porche v. Gulf Mississippi Marine Corp., 390 F.Supp. 624, 628 (E.D.La.1976):
The word “employee” may, or may not, embrace a borrowed servant, depending on the intention of the parties and whether under their arrangement the term “employee” was intended to reflect that person’s Jones Act status or whether it was designed merely to adopt the conventional definition by looking only to the payroll relationship. [Emphasis added.]
The indemnity clause in Porche, provided as follows:
In Coastal’s indemnity claim is based on a contract clause that reads is part:
Fluor assumes all risk of liability in connection with injury or death of any of its employees[5], its authorized agents or representatives acting as a crew aboard the BARGE as shipri-ders aboard the TUG, or CREW-BOAT and FLUOR agrees to indemnify and hold OWNER harmless and its subsidiary corporations harmless against and from all claims, demands or cause or actions which may be asserted by any such crew member or shiprider against OWNER and/or the TUG or CREWBOAT arising out of or in connection with any such injury or death, however caused and whether resulting in part from the negligence of OWNER, but excluding OWNER’S soul [sic] negligence or fault.
[Emphasis added.]
Id., 390 F.Supp. at 628-629.
This indemnity clause in Porche was not reciprocal. The emphasis in the contested contractual clause in Porche is, first, on the assumption by one party, Flour, of “all risk of liability in connection with injury or death of any of [Flour’s] employees”, and, secondly, on indemnifying the “Owner”, but with the exception of those instances where such injury or death may be caused by the sole negligence of the “Owner.”
The indemnity provisions in the instant case are quite different. The emphasis in the instant case is on unconditional reciprocal indemnification without regard to liability or negligence, whether that negligence be sole or partial, rather than on the assumption of liability by a particular party. The Porche agreement was not intended to accomplish the goal of avoidance of the expense of duplicative insurance coverage by the parties because the “Owner” in Porche would still have l^had to carry insurance as to Flour’s employees because of the Owner’s potential liability in the event that the Owner were determined to be solely negligent. Additionally, the reduction of litigation through simplification of the allocation of risk could likewise not be a primary goal of the Porche indemnity because of the potential for litigation concerning the degree of “Owner” fault. Therefore, the court’s language in Porche saying that, “It, therefore, seems appropriate to define the term ‘employee’ in the context of personal injury liability,” would not be appropriate in defining the term “employees” in the context of the blanket reciprocal indemnity provisions in the instant case which exclude all considerations of liability and negligence. In other words, respondeat supeñor and its related concept of borrowed servant are liability concepts which are employed in an attempt to assign liability based on concepts of responsibility and vicarious negligence, as distinguished from the reciprocal indemni *114 ty provisions in the instant case which were intended to simplify matters by making it unnecessary to resolve disputes concerning liability, negligence and vicarious responsibility.
While it may seem unfair at first to saddle Bay Coquille for liability for Darty if he was acting under the supervision of Falcon, which Bay Coquille would have to prove in order to support it borrowed servant allegation, it seems equally unfair to allow Bay Coquille to saddle Falcon with the liability for an employee of a subcontractor, Tom’s Welding, selected by Bay Coquille. Add to this the fact that Bay Coquille admits in its brief that Bay Coq-uille, not Falcon, paid Tom’s Welding for Darty’s work. Moreover, as it has been held that indemnification language that is as sweeping as that found in the instant case is broad enough to infer the intention that the indemnitee should be indemnified even for its own negligence, then there is nothing intrinsically offensive about allowing Falcon to 1 iSbe indemnified for Darty’s injuries in spite of the fact that Falcon’s alleged negligence through its exercise of control over Darty as his borrowing employer may have been a cause of Darty’s injuries.
In Theriot v. Bay Drilling Corp., 788 F.2d 527, 540 (5 Cir.1986), the court found that sweeping indemnity language virtually identical to that found in the instant case was sufficient to express the intention of providing indemnification even in the case of the indemnitee’s own negligence:
“Long-established general principles of interpreting indemnity agreements require that indemnification for an indem-nitee’s own negligence be clearly and unequivocally expressed.” Seal Offshore, Inc. v. American Standard, Inc., 736 F.2d 1078, 1081 (5th Cir.1984). An indemnity provision should be construed to cover “all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties.” It should not be read, however, “to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage.” Corbitt v. Diamond M. Drilling Co., 654 F.2d at 333. We find that the above quoted language, indemnifying Bay Drilling “without limit and without regard to the cause or causes thereof or the negligence of any party,” clearly and unequivocally provided Bay Drilling with indemnification for its own negligence. We note that in a recent case we perceived no ambiguity in a mutual indemnity provision identical to that before us today, but described the provision as providing for indemnification of employees “regardless of whose fault caused the injury.” Blanks v. Murco Drilling Corp., 766 F.2d 891, 894 (5th Cir.1985) (emphasis added). [Emphasis added.]

Id.

It is no more unfair to require Bay Coquille to indemnify Falcon for Falcon’s borrowed employee than it would be to require Bay Coquille to indemnify Falcon for Falcon’s own negligence, which the Contract clearly requires Bay Coquille to ludo under the circumstances defined by the reciprocal indemnity clauses found in § 14.8 and § 14.9. The reciprocal indemnification regardless of fault found in § 14.8 and § 14.9 is repeated and reemphasized in § 14.13 of the Contract which provides:
Indemnity Obligation: Except as otherwise expressly limited herein, it is the intent of parties hereto that all indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, para *115 graphs 14.1 through 14.12 be without limit and without regard to the cause or causes thereof (including pre-exist-ing conditions), the unseaworthiness of any vessel of any vessel of such negligence be sole, joint or concurrent, active or passive. ... [Emphasis added.]
In Weathersby v. Conoco Oil Co., 752 F.2d 953, 955 (5 Cir.1984), the injured plaintiff, Tommy Lynn Weathersby, was a direct employee of National Supply Company, which company was engaged by Co-noco, the well and platform owner. Weathersby sued Conoco and Global Marine Drilling Company, the rig owner for personal injury. Conoco and Global Marine filed cross-claims against each other based on the reciprocal indemnity provisions found in the Drilling and Rework Contract (“Contract”) existing between them. Global Marine argued that it was entitled to indemnity because Weathersby should be considered to be a Conoco employee under the Contract in spite of the fact that he was paid by his direct employer, National Supply Company, because Co-noco engaged the services of National Supply. Paragraph IV(D)(3) avoids the inquiry that is the subject of the instant case by specifying who shall be considered to be the employees of whom:
[Global Marine] agrees that all employees or subcontractors engaged by [Global Marine] to perform |1fisuch services shall be the employees and subcontractors of [Global Marine] hereunder, and [Conoco] agrees that all employees or subcontractors engaged by [Conoco] to perform such services shall be the employees and subcontractors of [Conoco] hereunder.
The Weathersby court explained that:
The plain language of § IV(D)(3) indicates that, for whatever purpose, employees engaged by Global Marine are deemed Global Marine employees and employees engaged by Conoco are Co-noco employees.... Hence, we agree with the district court in concluding that the only reasonable explanation for § IV(D)(3) is that it provides a test for identifying the “employer” of a subcontractor’s employees for purposes of indemnity. [Emphasis added.]
Id., at p. 956.
Had there been a provision in the Contract in the instant case such as § IV(D)(3) in the Weathersby case, it would be clear that Darty would be considered to be Bay Coquille’s employee because it was Bay Coquille who retained the services of Darty’s employer, Tom’s Welding, and not Falcon. Therefore, while we can say that Falcon’s argument is not inconsistent with Weathersby, in the absence of a clause defining “employees” in the instant case we cannot say that Weathersby unequivocally supports Falcon.
Bay Coquille cites Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 500 (5 Cir.2002), in support of its contention that under the general maritime law the term “employees” necessarily includes borrowed employees.
Forest tries to distinguish the finding that it is Dahlen’s borrowing employer on the grounds that Johnson and Me-lancon both allowed the platform owner to be considered the borrowing employee for the purposes of the LHWCA but not for the purposes of indemnity between the borrower and the borrowee, i.e., the entity that lent the employee to Forest. As Security points out, |1fihowever, Forest is not seeking indemnity from the company that it borrowed Dahlen from (in this case Island), but is instead seeking indemnity from a third party that for all accounts is unrelated in any way to Dahlen. [FN9 omitted.] The reason *116 ing of the district court that Forest was the borrowing employer should therefore be upheld. [Emphasis added.]

Id.

The result in Dahlen does not mean that Falcon as Darty’s borrowing employer in the instant case should indemnify Bay Coquille. In seeking indemnity from Bay Coquille, Falcon is not “seeking indemnity from a third party that for all accounts is unrelated in any way to” Darty, because it was Bay Coquille who engaged Darty’s services through Tom’s Welding and paid Tom’s Welding for them. Moreover, Falcon is not seeking indemnity from Tom’s Welding, the company from whom it borrowed Darty.
Johnson v. Amoco Production Co., 5 F.3d 949, 951 (5 Cir.1998), stands for the proposition that an employee may be considered to be a borrowed employee of one company for workers’ compensation purposes while simultaneously being considered to be the employee of another company.[6] The plaintiff, Johnson, a wage employee of TCS, was injured at an Amoco facility:
In the main action — Johnson’s tort claim — Amoco successfully argued to the district court that it (Amoco) was Johnson’s statutory employer, thereby barring that claim under Louisiana’s worker’s compensation law. [FN4 omitted.] Having succeeded in avoiding tort liability to Johnson, [FN5 omitted.] Amoco next moved for summary judgment on its indemnity and defense claim against TCS. In opposing that motion, TCS advanced two defenses. [FN6 omitted.] First, TCS argued that|17Amoco’s status as Johnson’s statutory employer excluded him from coverage under the indemnity agreement as it only applies to “employees” of TCS.

Id.

The indemnity provision at issue in Johnson provided as follows:
Contractor [TCS] assumes all liability for and hereby agrees to defend, indemnify and hold Amoco, its joint owner or owners, if any, and their losses, costs, expenses and causes of action, including attorney’s fees and court costs, for injuries to and death of Contractor’s and its Subcontractor’s employees, arising out of, incident to, or in connection with any and all operations under this contract
[[Image here]]
The Johnson court explained that:
A person may be a statutory employee of one company under Louisiana’s worker’s compensation laws while remaining the “common law” or payroll employee of another. [FN11 omitted.] Johnson has been classified under statutory law as Amoco’s “employee” only for the narrow purpose of limiting Amoeo’s tort liability. A classification under this statutory scheme of risk-avoidance has little if any relevance to the interpretation of a contractual term. Rather, as the district court correctly noted, that term is interpreted by ascertaining the common intent of the parties.
Id. at p. 953.
The Johnson court then held that:
We interpret these terms of the contract (unless they are technical terms or terms of art) by giving them their generally prevailing meaning. [FN14 omitted.] And when the terms of a contract *117 are clear and explicit and lead to no absurd consequences, no further inquiry may be made in search of the parties’ intent. [FN15 omitted.]
The term “employee” used in the master contract between TCS and Amoco is clear and has a generally prevailing meaning: an employee is one who works for another for a salary or wages. [FN16 omitted.] The most frequently encountered confirming criteria of this relationship is the identity of the one who directs and controls the work and |1sthe worker, an issue not disputed in this case as ⅛ TCS has admitted that Johnson was allegedly injured while working in the course and scope of his duties as a field mechanic for TCS. Moreover, TCS’s master contract with Amoco mandated that Amoco would have no direction or control over TCS or its employees other than in the results to be obtained
Id. at p. 953.
While Johnson> as far as it goes, appears to support Falcon, it is not disposi-tive as the indemnity agreement in Johnson was not reciprocal in nature.
Moreover, there is in Johnson an additional provision in the contract clarifying the meaning of employee not found in the contract between Falcon and Bay Coquille in the instant case:
Paragraph six of this contract states that “anyone used or employed by Contractor [TCS] ” shall not be “deemed to be the agent, servant, or representative of Amoco.” Simply put, this paragraph unequivocally declares that TCS’s employees shall remain TCS’s employees for purposes of TCS’s contractual relationship with Amoco. Under that relationship, TCS’s employees are those who are “used or employed” by TCS. Accordingly, we conclude, as did the district court, that Johnson — who was on the payroll of TCS, and was presumably under TCS’s supervision and control, while engaged in performing TCS’s repair and installation work order with Amoco — ■ was the employee of TCS for purposes of the indemnification provision.
Id., at p. 953.
There is no reference, to a reciprocal indemnity agreement in Howell v. America Cas. Co. of Reading, 96-0694 (La.App. 4 Cir. 3/19/97), 691 So.2d 715. As noted earlier in this opinion in connection with the analysis of the Cormier case, cases involving indemnity provisions that are not reciprocal are not persuasive in the instant case. Therefore, while the discussion in Howell of the factors used to determine the existence of a borrowed employer-employee | ^relationship is well expressed, it sheds no light on the interpretation of the reciprocal indemnity provisions in the instant case.
In Melancon v. Amoco Production Co., 834 F.2d 1238, 1243 (5 Cir.1988) the contract also contained a specific clause defining who should be considered an employee of whom:
Contractor [Beraud] shall be an independent contractor with respect to all work done and services performed hereunder, and neither [Beraud] nor anyone used or employed by [Beraud] shall be deemed for any purpose to be the agent, servant, or representative of Amoco in the performance of such work or services or any part thereof, or in any matter dealt with herein, and Amoco shall have no direction or control of [Beraud], or its employees and agents, except in the results to be obtained.
In Melancon, the contractor, Beraud, agreed in the “Well and Lease Service Master Contract” to indemnify Amoco for any injuries to any of Beraud’s employees. The Melancon court held that while the *118 injured plaintiff, Mr. Melancon, was Amoco’s borrowed employee, borrowed from Beraud, he would be considered to be Ber-aud’s employee for purposes of requiring Beraud to indemnify Amoco, because of the above quoted provision. However, there was no question of reciprocal indemnity provisions in Melancon.
The contract in the instant case does not contain provisions such as those found in Weathersby, Johnson, and Melancon, clarifying how to determine which employer to attribute an employer to for indemnity purposes. However, we do not infer from this omission the intention of Falcon and Bay Coquille that Falcon must indemnify Bay Coquille for Falcon’s borrowed employees even when Bay Coquille contracted for and paid for their services.
| i>nWhile the contract in Demette v. Falcon Drilling Co., Inc., 280 F.3d 492 (5 Cir.2002) did have a reciprocal indemnity provision that one of the parties sought to enforce, there was no borrowed employee issue and there was no dispute as to the interpretation of the language in the indemnity agreement. As to the indemnity agreement in Demette, the court was called upon to decide first whether the contract was maritime in nature and second whether § 905(b) of the Longshoremen and Harbors Workers Compensation Act barred recovery under the indemnity clause of the contract. The Demette court found that the drilling contract was a maritime contract and that § 905(c) of the LHWCA created an exception to § 905(b) by providing for the enforceability of indemnity provisions when they were reciprocal. Other than standing for the proposition that reciprocal indemnity provisions are enforceable, Demette provides no guidance for us in the instant case. There is no dispute in the instant case concerning the enforceability vel non of the reciprocal indemnity provision; the dispute is over the meaning of the term “employees.”
Lewis v. Diamond Services Corp., 93-1150 (La.App. 1 Cir. 5/20/94), 637 So.2d 825 is inapplicable to the resolution of the instant case for the same reasons that Demette, supra, is, the only difference being that the Lewis court held that § 905(c) of the LHWCA made the reciprocal indemnity provision enforceable in spite of the Louisiana Oilfield Anti-Indemnity Act, LSA-R.S. 9:2780.
Spell v. N.L. Industries, Inc., 618 So.2d 17 (La.App. 3 Cir.1993), like Rodrigue and Lewis, supra, did not involve the question whether the term “employee” in the reciprocal indemnity provision in the contract included [1 borrowed employees. Nothing in Spell other than the court’s statement that the intent of the parties should govern the interpretation of the contract has any bearing on the outcome of this case.
Curtis Callais Welding, Inc. v. Stolt Comex Seaway Holdings, Inc., 2003 WL 22966344 (E.D.La.), involves reciprocal indemnity provisions, but they are not knock for knock.
After reviewing all of the foregoing cases we conclude that the intention of the parties controls; that the purpose of the reciprocal indemnity agreement is the elimination of the expense of redundant insurance coverage and unnecessary litigation; that this purpose can only be achieved by the enforcement of the reciprocal indemnity provision; that the agreement cannot be enforced if the indemnities are extinguished by confusion or otherwise allowed to cancel each other out; that the fact that Darty might be Falcon’s borrowed employee for workers compensation purposes does not mean that he is Falcon’s employee for indemnity purposes; that the determination of whose employee Darty should be considered to be for indemnity purposes should be made on the basis of *119 what best achieves the objectives of the reciprocal indemnity provisions; and that the parties did not intend that an employee of a contractor hired and paid for by Bay Coquille should be considered to be an employee of Falcon for indemnity purposes.
In order to achieve the objective of avoiding redundant insurance coverage, we must assign Darty solely to Falcon or solely to Bay Coquille for purposes of indemnity. In deciding which party to assign Darty to, we must also bear in mind the second objective of the reciprocal indemnity agreement — the reduction in unnecessary litigation. In the instant litigation it is certainly easier and more efficient to find that Bay Coquille retained and paid for the services of Tom’s | ¡^Welding and its employee, Darty, which is uncontested, than it is to determine whether Darty is Falcon’s borrowed employee. Additionally, Bay Coquille’s retention of Tom’s Welding antedates the instant in time at which Darty arguably became Falcon’s borrowed employee. This is reinforced by Bay Coq-uille’s payment to Tom’s Welding for Darty’s services. In that sense, it follows that deciding that Tom’s Welding is one of Bay Coquille’s “contractors” under § 14.9 should result in the least amount of litigation and, therefore, is the result intended under the contract. Thus, under the facts of the instant case where either party could arguably be found to owe indemnity to the other, the retention of Tom’s Welding by Bay Coquille along with the payment to Tom’s Welding for Darty’s services by Bay Coquille takes precedence under the indemnity contract over Falcon’s alleged status as Darty’s borrowing employer as the most likely intention of the parties and as the most effective means of achieving the purposes of the reciprocal indemnity agreements, the elimination of redundant insurance coverage and a reduction in the expense of litigation.[7]
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.

. The exact argument in Bay Coquille's original appellate brief on this point is:
But for the Exception Clause, Falcon and its employees would qualify as one of Bay Coquille's contractors under Paragraph 14.9, which would nullify Falcon’s indemnity obligations to Bay Coquille if one of Falcon's employees, such as Darty here, was injured.

. Emphasis original with Falcon.

. Id., at p. 255.

. Id., at p.256.

. Emphasis added.

. This is apparently what the trial court has done in the instant case. It has been called to our attention that on November 24, 2003, subsequent to the time that the instant appeal was lodged, the trial court rendered another motion for summary judgment support by written reasons finding that Darty was the borrowed employee of Falcon. That judgment is not before this Court on this appeal.

. Had Falcon borrowed Darty from a third-party unrelated to Bay Coquille we might have reached a different result. See Dahlen, supra.